929 So.2d 789 (2006)
STATE of Louisiana, Plaintiff-Appellee,
v.
Edward ROBERSON, Defendant-Appellant.
No. 40,809-KA.
Court of Appeal of Louisiana, Second Circuit.
April 19, 2006.
*794 Indigent Defender Board by Pamela Smart, Andrew Jacobs, Louisiana Appellate Project by Peggy Sullivan, for Defendant-Appellant.
J. Schuyler Marvin, District Attorney, Joseph Gregorio, Assistant District Attorney, for Appellee State of Louisiana.
Before GASKINS, MOORE and LOLLEY, JJ.
LOLLEY, J.
A unanimous jury from the Twenty-Sixth Judicial District Court, Parish of Bossier, State of Louisiana convicted Edward Roberson of second degree murder in violation of La. R.S. 14:30.1 and of obstruction of justice in violation of La. R.S. 14:130.1. Roberson was sentenced to serve life imprisonment at hard labor without benefits for the second degree murder conviction and the maximum sentence of 40 years at hard labor to be served consecutively for the obstruction of justice conviction. Roberson appeals his convictions and sentences. For the following reasons, both convictions and sentences are affirmed.

FACTS
On the night of August 17, 2003, Roberson rented room number 107 at the David Motel in Bossier City, Louisiana. Patricia Tubbs, the desk clerk, testified that she saw Roberson twice that night. First, Roberson rented room 107 for two hours and then he returned at approximately 9:30 p.m. to rent the room for the entire night. Tubbs related that Roberson paid for the room with a credit card and showed his driver's license as proof of identity. The following morning Doris Watkins, a housekeeper at the motel, entered room 107 at approximately 11:00 a.m. and found it ransacked and covered with blood. She testified that she had seen a black man leave the room an hour earlier, but could not identify the man.
Detective Patrick McWilliams of the Bossier City Police Department reported to the motel and took charge of the crime scene. He stated that it appeared that blood was strewn throughout the room, on the walls and on the floor. He testified that the police roped off a large crime scene area including the east side of the parking lot where a bloody shoe print was found. Detective McWilliams reported that the housekeeping staff and another witness described an older model four-door blue car as having been at the scene earlier that morning. He discussed the contents of photographs of the motel and room entered in evidence. Detective McWilliams related that the state of room 107 indicated a very violent crime had occurred. Among the most relevant evidence in the room noted by Det. McWilliams was a Kool brand cigarette found *795 lying on top of a blood spot on a table. He testified that the cigarette had been lit when it was put down on top of the blood spot and that it burned down, leaving about an inch or so of ashes attached to the butt. He stated that this was significant because the blood was on the table prior to the cigarette being laid down. Detective McWilliams testified that most of the bedding, including the mattress pad, sheets and comforter, was missing from the room. He described seeing a blood-soaked pillow sham with possible knife marks or slits from a sharp object. He stated that the headboard had been taken off the wall, and the telephone was ripped out of the wall. He also related that the police found a Lifestyle condom wrapper in the room and evidence that someone may have tried to clean up in the bathroom.
Detective McWilliams discussed the extensive blood spatters found in the room on the wall, phone, headboard, and even on the ceiling. He also stated that the carpet was soaked in blood even into the padding underneath, and he described a section of the carpet that appeared to show the outline of a body. He also related that a tooth was found on the floor which was subsequently tested for DNA evidence.
Detective McWilliams stated that after discovering that Roberson had rented the room the night before, police took him into custody at approximately 3:00 p.m. Roberson's car, which matched the description of the vehicle at the scene that morning, was seized and searched. The police obtained a search warrant for Roberson's residence and while in his bedroom, police found and seized a credit card that matched the transaction at the David Motel along with the receipts of the transactions, an ATM card, an identification card, and a pair of flip-flops with apparent blood droplets. A carton of Kool cigarettes and a Lifestyle condom were also found in his bedroom.
Detective McWilliams reported that the police gained information that Majorie Rambin Smith had been at the motel room at the time of the crime, and her biological parents submitted to DNA testing. The tooth recovered from the hotel room was tested, and Stewart Raley, an expert in DNA analysis with the North Louisiana Crime Lab, testified that the DNA extracted from the tooth was five million times as likely to be a profile matching the trio of Smith and both her parents than a trio of the parents with a random person. Raley testified that DNA evidence of both Smith and Roberson were present on the flipflops seized from Roberson's bedroom. He stated that the DNA profile on the shoes matched that taken from a swab of the bloody shoe print in the motel parking lot.
Detective Shannon Hodges of the Bossier City Police Department Crime Scene Investigation and Latent Fingerprint Division testified that the blood stain beneath the cigarette found in the motel room was identified as having the DNA of Smith and the Kool cigarette butt had the DNA of Roberson. He said that the blood spatters on the wall and DNA extracted from the carpet were tested and were found to match Smith's DNA. Detective Hodges stated that the bloody foot print left outside the entrance to room 107 on the concrete parking lot was difficult to match because the blood did not completely saturate the entire bottom of the shoe and because the concrete was irregular. However, he testified that he made a comparison between the bottom of the shoe and the shoe print and found that the tread pattern was very similar. Detective Hodges prepared photographic stills of a security video taken at a Diamond Shamrock store which showed that Roberson shopped there hours before he checked into the motel. In the photographs, Roberson *796 was shown wearing the flip-flops seized from his bedroom, a white shirt with an American flag on the front, and the same green cap that he wore when transported to the police station. Detective Hodges testified that the victim's blood was found on the bill and front of that cap. He also testified that blood samples were taken from the back wall of Roberson's trunk and from a green hard case and a gray tool kit found inside the trunk, which DNA tests determined to be the blood of Smith. Also, a black funnel was found inside Roberson's vehicle which had blood evidence determined to be that of Smith. Finally, Det. Hodges testified that he had no other explanation as to how those blood samples got into Roberson's car except the likelihood that Smith was in it.
Daryl Worley, a detective with the Bossier City Police Department, testified that he noticed a liquid which appeared to be water pooling under the trunk of Roberson's car. He stated that the liquid pooled under the trunk again when the car was transported to the police department, but that he did not think that the liquid had been tested.
Detective McWilliams stated that Roberson made three cash withdrawals at the same location within approximately one hour on August 17, 2003. He said that in his experience, that type of activity coupled with the lack of evidence that Roberson made cash purchases at either the Diamond Shamrock store or the David Motel, suggested possible drug purchases. The Barksdale Federal Credit Union provided police with photographs taken at the ATM. The photographs depict a blue car with a black male conducting the transactions. The photograph of one transaction includes a white passenger's legs and arms which appear feminine. Smith was a white female.
Raley's testimony confirmed testimony that Smith's DNA evidence was found on the blood in room 107, on Roberson's shoes, on the bloody footprint on the pavement outside the room, in the trunk of Roberson's car, as well as on the back of the head rest and below the ashtray under the door on the passenger side.
Todd Smith, an investigator with the Harrison County Sheriff's Office in Texas, testified that human remains which appeared mummified were found in an abandoned house three miles east of Scottsville, Texas and seven miles west of Waskom, Texas on February 17, 2005. The distance between the abandoned house and the David Motel was calculated as being 32.4 miles by Det. Hodges. Detective Smith testified that the only indication that the body was probably female was toenail polish. The body was moved to Dallas, Texas for autopsy and identification. Dr. Robert Williams, a forensic odontologist, examined the dental records of Smith as forwarded by Dr. Dan Moore from Texarkana. He stated that the records were very adequate to make the comparison, and he concluded that the body was Smith's.
Dr. Sheila Spotswood, a medical examiner for Dallas County certified in forensic pathology, conducted the autopsy. She testified that when she viewed the body, it appeared to be in a skeleton-like condition and basically was primarily skin and bones with leathery, mummified skin covering the bones. She stated that the head was received separate from the body, explaining later that she could only hypothesize that there had been trauma to the neck as it was missing. Upon examination of the skull, Dr. Spotswood found evidence of "a very large" fracture crossing the right side, a fracture to the right cheekbone with part of the cheekbone missing, fractures in the forehead area, fractures over *797 the right eye and inside the eye, and a fractured nose (of which part of the left side was missing). She explained the fractures inside the eye as being caused by an impact with "so much force that there were smaller bones that would shatter without being directly hit." Dr. Spotswood reported that the injuries "have the look of fractures that would occur in a living person." It was her opinion that Smith died "as a result of homicidal violence which included blunt force injuries."
Phillip Johnson, a resident of the David Motel, testified that he saw Smith the morning of August 18, 2003 at 6:00 a.m. He stated that she waved at him from inside room 107 as he left for work at 6:45 a.m. Johnson said Smith had been with a black man wearing blue jeans and a cap, but because the man had his head in a downward position that he did not see his face. Johnson testified that he had seen Smith with Roberson the afternoon before at an area pub and believed he had seen them together again that morning. Johnson stated that he recognized Roberson from his picture in the newspaper because he remembered seeing Roberson the afternoon before the murder and remarked that "the way his eyes they look like sleepy [sic], you know, one of the seven dwarfs."
Several phone calls were placed from Roberson's cell phone between 6:40 a.m. and 8:00 a.m. on August 18, 2003. The phone calls were determined to be associates of Smith. Those calls originated with the cell phone tower located at Pierre Bossier Mall on East Texas Street which shows that the calls were placed within a seven mile radius of that tower near the David Motel. Jim Williams of Floyd's Cingular Wireless testified that a call placed from Roberson's cell phone at 12:29 p.m. later that day originated at the tower located in Waskom, Texas. This was also determined to place the cell phone within a seven-mile radius from the Waskom, Texas tower. According to the testimony of Charles Collins, Roberson's employer, confirmed by phone records, Roberson called Collins at 1:15 p.m. from his residence in Shreveport. Collins stated that Roberson told him he was in the hospital and could not report to work.
Following a jury trial in the present case, Roberson was convicted by a unanimous jury of second degree murder and obstruction of justice. On the same day as Roberson's motions for new trial and post-verdict judgment of acquittal were denied, and without an express waiver apparent on the face of the record, he was sentenced to life imprisonment at hard labor without benefits for second degree murder. He was also sentenced to the maximum sentence of 40 years at hard labor for the conviction of obstruction of justice, to be served consecutively with the life imprisonment sentence. Subsequently, this appeal by Roberson ensued.

DISCUSSION

Sufficiency of the evidence
On appeal, Roberson raises four assignments of error. First, he contends that the evidence adduced at trial was not sufficient to support the convictions of second degree murder and obstruction of justice. Specifically, Roberson contends the state did not prove beyond a reasonable doubt, eliminating every reasonable hypothesis of innocence, that he committed the second degree murder of Smith or that he obstructed justice by disposing of her body. Finding that the circumstantial evidence against Roberson was overwhelming, we disagree.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Specific *798 intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Wilhite, 40,539 (La.App.2d Cir.12/30/05), 917 So.2d 1252. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the standard set in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Wilhite, supra. Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Durden, 36,842 (La.App.2d Cir.04/09/03), 842 So.2d 1244, writ denied, XXXX-XXXX (La.11/26/03), 860 So.2d 1131.
Pursuant to La. R.S. 14:130.1(A):
A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or
(b) At the location of storage, transfer, or place of review of any such evidence.
(2) Using or threatening force toward the person or property of another with the specific intent to:
* * *
(c) Cause or induce the alteration, destruction, mutilation, or concealment of any object with the specific intent to impair the object's integrity or availability for use in any criminal proceeding; . . .
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson, supra, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, XXXX-XXXX (La.01/08/99), 725 So.2d 1291; State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Neal, XXXX-XXXX (La.06/29/01), 796 So.2d 649, 657. Ultimately, all evidence, both direct and circumstantial, must be sufficient under the Jackson standard to prove guilt beyond a reasonable doubt. Id., citing State v. Rosiere, 488 So.2d 965, 968 (La.1986).
An appellate court reviewing for a sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When *799 the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Perry, 40,574 (La.App.2d Cir.01/25/06) 920 So.2d 934. A reviewing court accords great deference to a judge or jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.05/08/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, 98-0282 (La.06/26/98), 719 So.2d 1048.
As stated, we believe that the circumstantial evidence against Roberson implicating him as Smith's murderer is substantial. First, the David Motel desk clerk testified that Roberson paid for the room with a credit card and presented his driver's license  proving that room 107 was rented to him at the time of the murder. The driver's license shown to the clerk and the credit card receipts were found the day of the murder in Roberson's bedroom at his residence. On August 18, 2003, a David Motel housekeeper saw an unidentified black male leaving room 107 at approximately 10:00 a.m. A resident of the motel, Johnson, also saw a black male earlier that morning between 6:00 a.m. and 6:40 a.m. with Smith near and inside room 107. Johnson testified that the black man was wearing a green baseball cap which matched the description of the cap Roberson was observed wearing in the surveillance pictures taken at the ATM machine and on the video from the Diamond Shamrock store taken the night before the murder. Additionally, in the investigation immediately following the murder, connections were made between the brands of cigarettes and condoms found in room 107 and in Roberson's bedroom on the day of the murder.
The DNA evidence linking Smith to Roberson was also significant. Evidence of Roberson's DNA was found on the Kool cigarette discovered lying on top of a blood spot in room 107. The blood in the room was identified by DNA testing to be Smith's. Smith's DNA was also found in a blood stain on the strap and sole of Roberson's flip-flops seized from his bedroom and identified as being the shoes he wore the day he checked into the David Motel. Roberson's DNA was also found on the shoes and Raley, the DNA expert, testified that the DNA profile found in the bloody shoe print in the motel parking lot matched the DNA profile found on Roberson's shoes. Smith's DNA was found on the bill and inside of a green baseball cap Robinson wore when he was questioned by police. Of extreme significance to the obstruction of justice conviction was that Smith's DNA was found on multiple surfaces in the trunk of Roberson's car  the car which matched the motel staff's description of the car at the scene the morning *800 of the murder. The testimony from Det. Worley that liquid dripped from Roberson's trunk clearly suggests he attempted to clean out the trunk of his car.
Moreover, corroborating evidence was presented with the calls placed from Roberson's cell phone on the morning of August 18, between the hours of 6:40 a.m. and 8:00 a.m. all within a seven-mile radius from the tower at Pierre Bossier Mall. Another call at 12:29 p.m. originated at a tower in Waskom, Texas, which is approximately seven miles east of the abandoned house where Smith's body was found. Further, Roberson called his employer at 1:15 p.m. from his house in Shreveport indicating he was in the hospital and would not be able to report to work that day.
While this is a case of circumstantial evidence, the evidence presented leads to inferences of facts which, when viewed in a light most favorable to the prosecution, is more than sufficient to support the verdicts beyond a reasonable doubt. Also, because Smith's body was found over 30 miles from the site of the murder, her DNA was found in the trunk of Roberson's car, and liquid was seen dripping from his trunk on the day of the crime, it is inferred that he intentionally tampered with evidence relevant to the investigation. Hence, the evidence clearly supports the convictions for second degree murder and obstruction of justice. This assignment of error is without merit.

Challenges for Cause
In his second assignment of error, Roberson argues that the trial court erred in improperly refusing to excuse certain prospective jurors for cause prejudicing him, and, as a result, that he exhausted all of his peremptory challenges. He contends that these prospective jurors were biased based upon the influence of prior information about the crime in the press and that one juror failed to respect Roberson's right against self-incrimination. For the following reasons, we find this assignment of error is without merit.
The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercise of cause and peremptory challenges. State v. Ball, 2000-2277 (La.01/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). Challenges for cause are governed by La. C. Cr. P. art. 797, which states that the state or the defendant may challenge a juror for cause on the grounds that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
Under La. C. Cr. P. art. 800, a defendant may not assign as error a ruling refusing to sustain a challenge for cause, unless he objects at the time of the ruling and states *801 the nature of the objection and the grounds for it.
A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189 (La.06/30/95), 658 So.2d 683. When a defendant uses a peremptory challenge after a challenge for cause has been denied, the defendant, in order to obtain a reversal of his conviction, must show erroneous denial of the challenge for cause and use of all peremptory challenges prior to completion of the jury panel. State v. Scott, 04-1312 (La.01/19/06), 921 So.2d 904; State v. Ross, 623 So.2d 643 (La.1993).
A refusal by a trial judge to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Robertson, 92-2660 (La.01/14/94), 630 So.2d 1278. If a juror who has acquired knowledge about the case through the media can sufficiently lay aside his impression of the defendant's guilt or innocence and render a verdict based on the evidence presented, he is competent to serve as a juror. State v. Frank, XXXX-XXXX (La.01/17/01), 803 So.2d 1.
The record shows that Roberson used all twelve peremptory challenges. We note that Roberson does not specify any jurors which may have been accepted merely because all the peremptory challenges were used. His objections were noted to the denials of challenges for cause. The record of voir dire of the jurors named in the assigned error is analyzed herein for any showing of abuse of discretion which led to an erroneous denial of challenge for cause, in the order of the prospective jurors' questioning.

Lee Edge
When questioned, Edge admitted that he learned about the case through newspaper, television, and talking to a co-worker who lives in Scottsville, Texas. He stated that "there's been a lot of information out there," and when asked if he could be impartial and decide the case on the facts presented, said, "I don't  think I can, yes, Yes, I'll do my best." When questioned further, he told the court, "I don't think I can act like I've not heard any of it, but I can make a decision, you know, not to use that information." He said he thought he could be impartial to both the state and Roberson. Edge told the defense counsel that he did not believe everything he read in the newspaper and that he could "listen to the facts and make a decision on that." Roberson challenged Edge for cause, stating that he hesitated when answering a question and had too much information to be impartial. The state argued that Edge had said he could judge the case from the facts presented. The court ruled that Edge had been "sufficiently rehabilitated" and denied the challenge for cause. Ultimately, the defense exercised a peremptory challenge to excuse Edge. On review of the record, there is no apparent abuse of discretion in the trial court's ruling denying Roberson's challenge for cause. See State v. Robertson, supra; State v. Frank, supra.

Carol Corn
The record shows that Corn stated that she had heard about the case from "television and newspapers from day one." She said that she kept track of the case because "it happened in Bossier and it was a pretty horrible thing." She told the court that she thought she could put aside what she heard and judge the case on the *802 evidence presented. When questioned by the defense counsel if she could set aside the things she had read, she answered, "I would hope so." She then said she could separate information from the media from the evidence presented because "aren't you supposed to just listen to what is presented in court and nothing else." Corn also expressed concern over the graphic nature of the evidence to be presented, but was subsequently rehabilitated. Roberson challenged for cause based upon Corn's knowledge of the case through the media, and the state objected, arguing that she had been properly rehabilitated. The challenge for cause was denied. Based upon the record, there is no showing that the trial court abused its discretion in this ruling. See State v. Robertson, supra; State v. Frank, supra.

Tiffani Henson
During voir dire, Henson stated that she thought Roberson should testify so that the jury could hear "his side of the story." However, she stated that if she was instructed by the trial court that Roberson had a right not to testify, she could respect that. The court instructed the prospective jurors, specifically naming three including Henson, that Roberson had a constitutional right against self-incrimination. According to the record, all three responded that they understood the court's instruction and agreed. Roberson challenged for cause, the state argued that she had been rehabilitated, and the trial court denied the challenge for cause. The defense used a peremptory challenge against Henson. Again, we see no abuse by the trial court in its determination. See State v. Robertson, supra; State v. Frank, supra.

Jacqueline Cottrill
Initially, Cottrill appeared to have vacillated between being able to separate her knowledge of the case gained through media exposure and the evidence presented at trial. However, when questioned by the defense counsel, she stated that she tried "to be very open-minded and non-judgmental as far as making decisions go [sic]." She stated that she could put aside any prior knowledge during deliberations. Roberson challenged for cause, stating that Cottrill was "a little bit hesitant" and commenting on her tone of voice. The state again argued rehabilitation, and the trial court denied the challenge with an explanation of being "impressed with her honesty." Roberson later used a peremptory challenge to excuse her. From the record, there is no showing of abuse of discretion in denying this challenge for cause. See State v. Robertson, supra; State v. Frank, supra.

Tina Ponder
When Ponder was questioned about her memory of what she had read about the case in the newspaper, she stated, "I don't remember what I read that well." Then she said, "I believe I could be impartial." She was questioned further by the defense counsel and continued to maintain that she could be impartial. Roberson challenged Ponder for cause based upon the same argument as advanced in prior challenges; the state argued that Ponder had maintained her ability to be impartial from the beginning; and, the trial court denied the challenge for cause. Ponder was questioned further during voir dire. She was ultimately admitted to the jury. There is no showing of abuse of discretion in the trial court's ruling.

Excessive Sentences
Next, we address Roberson's argument that his sentences were excess I've because maximum sentences were imposed *803 for both offenses and each was ordered to be served consecutively with the other.

Sentence for Second Degree Murder
Roberson was convicted of second degree murder, a violation of La. R.S. 14:30.1. This statute imposes a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentences. State v. Bonner, 39,187 (La.App.2d Cir.12/22/04), 895 So.2d 1.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La. App.2d Cir.04/02/97), 691 So.2d 864.
In this case, the life sentence without benefit of parole, probation or suspension of sentence is mandatory for the crime of second degree murder and needs no justification. State v. Thornton, 36,757 (La. App.2d Cir.01/29/03), 836 So.2d 1235, writ denied, XXXX-XXXX (La.10/31/03), 857 So.2d 474; State v. Koon, 31,177 (La.App.2d Cir.02/24/99), 730 So.2d 503.
In State v. Johnson, XXXX-XXXX (La.03/04/98), 709 So.2d 672, in the context of habitual offender sentencing, the supreme court stated:
[T]o rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that: [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
It is the legislature's prerogative to determine the length of a sentence imposed for the crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Thornton, supra, citing State v. Armstrong, 32,279 (La. App.2d Cir.09/22/99), 743 So.2d 284, writ denied, XXXX-XXXX (La.04/07/00), 759 So.2d 92. Moreover, this court has afforded great deference to the legislature's determination of an appropriate minimum sentence. State v. Thornton, supra; State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614.
Arguments that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment contained in the Louisiana constitution have been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Thornton, supra.
In this case, Roberson has not sufficiently demonstrated he is the "exceptional" defendant for which downward departure from the statutory minimum sentence is required. The jury obviously accepted the overwhelming circumstantial evidence against Roberson, and he was accordingly convicted of second degree murder. When compared with the severity of the offense, the imposed sentence is neither grossly disproportionate nor shocking to the sense of justice. Accordingly, this court should not find the trial court's refusal to depart from the mandatory sentencing provisions *804 to be reversible error. See State v. Bonner, supra.

Conviction for Obstruction of Justice
Additionally, Roberson argues that his 40-year sentence for his conviction of obstruction of justice is excessive. Louisiana R.S. 14:130.1(B)(1) provides that, when the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than $1,000, imprisoned for not more than 40 years at hard labor, or both. Therefore, Roberson's 40-year sentence is the maximum term of imprisonment he could have received for a violation of La. R.S. 14:130.1.
Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Quebedeaux, 424 So.2d 1009 (La.1982), aff'd on remand, 446 So.2d 1210 (La.1984). A trial court has broad discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, an appellate court may not set aside a sentence as excessive. State v. Guzman, 99-1753 (La.05/16/00), 769 So.2d 1158; State v. Lingefelt, 38,038 (La.App.2d Cir.01/28/04), 865 So.2d 280, writ denied, XXXX-XXXX (La.09/24/04), 882 So.2d 1165.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.06/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982).
In this case, the trial court ordered a pre-sentence investigative report, which it referred to before sentencing Roberson. As reflected in Roberson's PSI, the trial court noted a number of arrests, charges, and convictions, including two felony convictions. The month after the murder of Smith, Roberson was arrested and charged with aggravated rape in DeSoto Parish, the trial of which was still pending at the time he was sentenced for Smith's murder. The trial court also considered the statements of Smith's family, as well as noting the added pain, anguish and suffering caused them by Roberson's moving and hiding of her body.
Based on the record before us, we conclude the trial court did not abuse its wide discretion in sentencing Roberson to the maximum of 40 years for obstruction of justice in this case.

Consecutive sentences
Finally, Roberson also argues that the trial court erred in ordering his sentences be served consecutively. When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Robinson, 33,921 (La.App.2d Cir.11/01/00), 770 So.2d 868. Here, considering the heinous nature of the crime *805 against Smith, along with the anguish it caused her family, including children, we believe the record provides an adequate factual basis to support consecutive sentences. The trial court did not err in this regard.

Other Crimes Evidence
We now consider Roberson's assignment of error regarding the admission of evidence of a prior crime. Roberson contends that the state had no proper purpose to introduce evidence related to the disappearance of his former wife, Katherine Robinson. Roberson contends that the prejudicial nature of admitting the evidence heavily outweighed the probative value.
Louisiana C.E. art. 404 B provides in part:
Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Evidence of other acts of misconduct is not generally admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. art. 404 B(1); State v. Jackson, 625 So.2d 146, 148 (La. 1993); State v. Fuller, 32,734 (La.App.2d Cir.12/17/99), 759 So.2d 104, writ denied, XXXX-XXXX (La.08/31/00), 766 So.2d 1273. This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his or her unrelated criminal acts. State v. Prieur, 277 So.2d 126, 128 (La.1973).
However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. Upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404 B. Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403; State v. Jacobs, 99-0991 (La.05/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002).
A trial judge is vested with wide discretion in determining relevance of evidence; his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981); State v. Murray, 36,-137 (La.App.2d Cir.08/29/02), 827 So.2d *806 488; writ denied, 2002-2634 (La.09/05/03), 852 So.2d 1020.
Here, the state filed a notice of its intention to use other crimes evidence pursuant to La. C.E. art. 404 B. A pre-trial hearing was held where testimony was introduced and arguments were heard. The trial court ruled in favor of the state and articulated well founded reasons for denying Roberson's motion in limine. More specifically, the trial court stated that there was "a clear preponderance of the evidence" that Roberson had committed the acts against Katherine Roberson. The trial court further explained that there were violent relationships between Roberson and both victims, that both victims engaged in high-risk lifestyles, and that both crime scenes indicated violent struggles. The trial court also gave limiting instructions to the jury before its deliberations concerning the use of the evidence presented concerning the disappearance of Katherine Roberson.
On appeal, the state argues that the evidence it presented has independent relevance other than to show Roberson's bad character or criminal disposition. It contends it was submitted to prove system, intent, plan, operation, identity, motive, lack of accident or mistake. The state contends this evidence illustrates the volatile nature of Roberson's relationship with both victims, his inability to maintain control over both relationships and that it proves these similar acts were by Robinson and not by someone else.
For those same reasons, we conclude that the evidence was properly admitted. The evidence which provided details of the investigation concerning Katherine Roberson indicated striking similarities to the homicide of Smith. The record shows that the state established that the disappearance and/or possible murder of Katherine Roberson actually occurred and that it was committed by Roberson  as he willingly described first-hand. Thus, that evidence regarding the details of Katherine's death, and Roberson's detailed knowledge of it, are relevant and critical as to his involvement in Smith's murder.
There was no testimony during the hearing regarding charges or convictions resulting from the investigation into Katherine's death. However, Chief Deputy D.E. Stevens of the Caddo Parish Sheriff's office investigated Katherine's disappearance in November 1988 and his testimony substantiated Roberson's connection to that crime. Chief Dep. Stevens testified that Katherine was married to Roberson and that their relationship was violent and abusive. He related that the victim, a white female, had a "high risk type lifestyle," presumably working as a prostitute. He testified that Roberson himself initiated the contact by calling a mental health facility in Sioux City, Iowa, where he had been a patient a year earlier. Chief Dep. Stevens stated that in telephone calls Roberson made to that facility in December of 1988, he told a nurse that he had shot his wife, left her body in the room "for about three days," put her in the trunk of his car, and then drove her to Texas where he buried her body on a family-owned farm in Burlington. He testified that the calls to Sioux City were traced back to Shreveport and the police were dispatched to Roberson's residence. Chief Dep. Stevens related that when he arrived at the residence, he witnessed a stand-off between Roberson and the SWAT team which lasted nearly 12 hours. The stand-off ended with Roberson's self-inflicted wound which was not fatal.
Following that, Chief Dep. Stevens interviewed Roberson on three different occasions beginning January 5, 1988. He testified that Roberson said that he and Katherine were having "a bad fight" and *807 fought all over the apartment when she "pulled a .22 caliber pistol on him." Although Chief Dep. Stevens stated that Roberson admitted killing his wife, he indicated that he did not intend to do so. When asked where he shot her, Chief Dep. Stevens indicated that Roberson pointed at his neck.
Although there was some evidence that Katherine had once been employed at a grocery store, Chief Dep. Stevens testified that friends and acquaintances of hers indicated that she maintained a high risk lifestyle and was known to be picked up off the streets. He further related that the woman's clothing found in a bag at the couple's residence/crime scene indicated "either a head or neck wound." He said that Roberson gave specific details about his involvement in Katherine's death and the disposal of her body, even drawing a map purportedly leading to her body. He reported that the police "spent several days down there trying to locate the body," but it was never recovered. He stated that although there was evidence the crime scene had been cleaned up, there were nevertheless indications that the crime scene had been very bloody and violent. The police found evidence of blood spatters in the apartment and blood under the threshold of a doorway.
Also, Don Ashley, an investigator with the Caddo Parish District Attorney's office gave testimony regarding the disappearance of Katherine that closely matched that given at the hearing by Chief Dep. Stevens. He stated that numerous blood stains were found in the couple's apartment. Ashley also said that when the trunk of Roberson's car was inspected it was found to have the "peculiar odor" of a decaying body, that the carpeting or mat in the trunk had been removed to expose bare metal, and that there were two boxes of baking soda found in the trunk. He discussed a receipt found in the couple's apartment dated the day after Katherine was reportedly last seen alive which showed the purchase of a chain saw, gas can, screwdriver, and deadbolt locks. He said the chain saw and gas can were never found. Ashley further testified about the negotiations police had with Roberson at the couple's apartment, and he related how Roberson shot himself in the chest upon exiting the apartment.
In our view, the facts between the two cases have compelling similarities. A review of Det. Patrick McWilliams' testimony in connection with Smith's murder underscores many similarities between the deaths of Katherine and Smith. In this case, Smith, also a white female, lived on the streets, was probably addicted to narcotics, and possibly worked as a prostitute. Detective McWilliams stated that his investigation indicated that Roberson and Smith had a relationship, likely one being a "John/call girl type situation." He testified that associates of Smith indicated that she and Roberson had a volatile relationship. Also remarkable is the similarity of the crime scenes which were indicative of extreme violence.
Additionally there was strong evidence that Roberson demonstrated a similar scheme in both deaths, including: Roberson was not a stranger to either victim; he had volatile and abusive relationships with each; an apparent loss of control in those relationships; violent crime scenes; high risk lifestyles of both victims; and, both victims likely suffered wounds to the head or neck (as indicated from blood stains found on Katherine's clothing at the Roberson apartment and as indicated in the autopsy evidence of Smith admitted at trial). There is also evidence that Roberson devised a similar plan in disposing of both bodies by removing them from a residence or rented room which would have directly *808 connected him with the crimes and then transporting their bodies in the trunk of his car to Texas where he disposed of them. There is also ample evidence showing that Roberson had a similar opportunity to kill both women because both women consented to be with him (one by marriage, the other by probable prostitution).
The evidence of the prior crime was also of great probative value to rebut Roberson's primary defense of misidentification as Smith's murderer. Roberson argued at trial that the evidence did not prove he was the last person to see Smith alive, which places a material fact at issue, namely identity. Other crimes evidence can be admitted to assist in proving a material fact at issue. See State v. Cooks, 36,613 (La.App.2d Cir.12/04/02), 833 So.2d 1034.
Roberson's actions of initiating his confession and then confessing to the murder of his wife to both the health care worker at the mental institution and to the police, together with the evidence found at his apartment substantiated Roberson's guilt in his wife's death. The evidence of his involvement in Katherine's death served to further debunk the argument of misidentification, as such evidence proved he had a history of volatile relationships with women, and that he used a similar method to kill them and dispose of their bodies. So considering, we find that the probative value/weight of this evidence far outweighed any inflammatory or prejudicial effect it may or may not have had on the jury. We further find that the evidence presented did in fact rise to the required level of clear and convincing evidence.
In any event, any error in the admission of other crimes evidence is subject to a harmless error analysis on appeal. The appropriate inquiry is whether the verdict actually rendered was surely unattributable to any alleged error. State v. McGee, 39,336 (La.App.2d Cir.03/04/05), 895 So.2d 780. In view of the strong and corroborating circumstantial evidence that Roberson committed the murder of Smith and removed her body from the crime scene, drove it to Texas and then dumped it at an abandoned house, we find that the verdicts are surely unattributable to any improper reference to the prior crime, making such reference harmless error. See State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102.

Error patent
We note that the record indicates an error patent. Here, the trial court imposed the sentences immediately after the denial of Roberson's motions for new trial and post-verdict judgment of acquittal. There is no showing on the record that Roberson waived the delay required by La. C. Cr. P. art. 873. However, he did not complain of actual prejudice, so the error appears harmless. See State v. Wilson, 469 So.2d 1087 (La.App. 2d Cir.1985), writ denied, 475 So.2d 778 (La.1985).

CONCLUSION
For the foregoing reasons, the convictions and sentences of Edward Roberson are affirmed.
AFFIRMED.
MOORE, J., concurs with additional written reasons.
MOORE, J., concurring.
I respectfully concur, observing that the state needlessly complicated this case by introducing a world of problematic evidence relating to the 1988 disappearance of Katherine Roberson. The state's ostensible purpose was to prove "motive, opportunity, intent, preparation, plan, *809 knowledge, identity, absence of mistake or accident" under La. C.E. art. 404 B(1), but the precise grounds were never clearly articulated.
In the first place, the defendant was never charged with any crime in connection with Ms. Roberson's disappearance, and his completely uncorroborated confession would not be sufficient to support a conviction of homicide. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. Moreover, the facts of the incidents in November 1988 and August 2003 do not strike me as "almost identical." State v. Bell, 99-3278 (La.12/8/00), 776 So.2d 418. Despite their predilection for a "high risk lifestyle," both Ms. Roberson and Ms. Smith put up a fierce struggle when confronted by violent assailants; this evidence proves a common reaction of frightened victims, not a modus operandi of the defendant. Finally, proof of other crimes under art. 404 B(1) must be by clear and convincing evidence. State v. Hills, 99-1750 (La.5/16/00), 761 So.2d 516; State v. Martin, 39,846 (La.App. 2 Cir. 8/17/05), 913 So.2d 863. As the majority acknowledges, the district court found that the state proved the other crime only by "a clear preponderance of the evidence," no ringing endorsement of the state's presentation.
The introduction of this evidence would have been much more crucial at the first trial setting, when the state was attempting to pursue the case "without the body." In February 2005, however, detectives discovered Ms. Smith's remains near Waskom, Texas, and forensic studies were conducted. At trial in April 2005, the state presented a truly outstanding case of circumstantial evidence: forensic experts, ATM and cell phone records, and the testimony of witnesses like Ms. Tubbs and Mr. Johnson, all of which was more than sufficient to prove the defendant's guilt. The introduction of the questionable other-crimes evidence was therefore harmless error. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Bell, supra.
For these reasons I concur in the judgment, but hope that in the future the state will not press the limits of admissibility under art. 404 B when such evidence is totally unnecessary to its case.