ROBERT A. CHAISSON, Judge.
|2On October 14, 2010, the Jefferson Parish Grand Jury indicted defendant, Denord M. King, for second degree murder, in violation of LSA-R.S. 14:30.1, and obstruction of justice by tampering with evidence, in violation of LSA-R.S. 14:130.1. At the arraignment, defendant pled not guilty.
Following the resolution of various pretrial motions, defendant proceeded to trial before a twelve-person jury on March 29 and 30, 2011. After considering the evidence presented, the jury found defendant guilty as charged on both counts. On April 7, 2011, the trial court denied defendant’s motion for new trial and thereafter sentenced him to life imprisonment without benefit of parole, probation, or suspension on the second degree murder conviction and to twenty years in the ^Department of Corrections on the obstruction of justice conviction, to run concurrently. Defendant now appeals.[1]

FACTS

On June 16, 2010, Denord King shot and killed Brian Williams. The facts surrounding the incident are as follows:
In June of 2010, Fallon Madison shared an apartment with her boyfriend, Brian Williams, in the Chateau Ames apartment complex located at 1521 Ames Boulevard in Jefferson Parish. On the afternoon of June 15, 2010, two black males, one approximately twenty-four years old and the other approximately seventeen years old, came to the apartment and attempted to purchase a firearm from Williams. The younger individual apparently tried to run with the gun, and Williams tried to tackle him to get the gun back. After this encounter, the two men left. However, Madison later observed the teenager pacing back and forth in the parking lot and also saw defendant, who was standing outside one of the buildings, talking to the teenager.
On June 16, 2010, the day of the shooting, Williams was standing outside his apartment with his cousin, Brandon Dillard, and several other people. Shaquille Smith[2] approached and told Williams that “they was coming to get you.” Meanwhile, the teenager that Williams got into a fight with the previous day w;as again outside the apartment complex walking back and forth. Growing agitated, Williams walked into the middle of the parking lot and *1151 began firing at this teenager who was later identified as Johnelle Walker.[3] Walker ran home. Smith quickly separated from Williams and Dillard who started walking towards a friend’s house.
^According to Dillard, as they reached the middle of the parking lot, defendant came from the side and started shooting. Dillard panicked and ran, while Williams started shooting at defendant. Williams was struck during the gunfire and died a few minutes later.
The police arrived at the scene, secured it, and began their investigation. Through witness statements and photographic identifications, the police developed defendant as a suspect and obtained an arrest warrant for him. Defendant turned himself into the police the next day. After being advised of his rights, defendant gave a statement to police in which he claimed that he started shooting at Williams because he saw Williams coming at him with a gun.
In addition to giving a statement, defendant also testified at trial. According to defendant, on the day of the shooting, he was riding a bike to the store to get cigarettes when he heard gunshots. As he looked to see where the shots were coming from, he fell off the bike and saw Williams coming at him with a firearm in his hand. Defendant explained that at the time of the shooting he was recovering from previous gunshot injuries, that he could barely walk, and that he still had a bad limp. Defendant thought that Williams could have been the person who previously shot him and that he was coming back to “finish what he started.” Defendant testified, “I grabbed my gun and went to shooting in my defense.” Defendant admitted that he emptied the entire thirteen-round magazine in his .40 caliber semi-automatic handgun, pulling the trigger each time. According to defendant, he never intended to kill Williams; he stated that he fired so many shots because he moved slowly due to his previous gunshot injuries and he was only trying to get away. Defendant observed the victim trip, and get back up. Just before he departed, defendant observed that Williams was still moving behind a vehicle; therefore, he did not think that Williams was dead.
| ¿Defendant further testified that upon leaving, he borrowed a friend’s car. As he was driving, defendant decided that he wanted to change his lifestyle. In an effort to facilitate this change, he threw the gun out the car window while on the Huey P. Long Bridge. Later that night, defendant heard that Williams had died and that he was wanted by the police in connection with Williams’ murder. At that point, defendant turned himself into police.

ASSIGNMENT OF ERROR NUMBER ONE

In this assigned error, defendant argues that the trial court erred in denying his motion for new trial because the evidence was insufficient to support the jury’s verdict. Defendant specifically argues that the evidence was insufficient to prove beyond a reasonable doubt that he acted with the requisite intent and that he did not act in self-defense. Defendant also contends that the State’s evidence proved manslaughter at best.
The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond *1152 a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 147, writ denied, 11-338 (La.6/17/11), 63 So.3d 1037.
In order to support a conviction for second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or |fifailure to act.” LSA-R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Patterson, 63 So.3d at 147.
The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with the specific intent to kill. State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied, 08-0228 (La.9/19/08), 992 So.2d 949. Moreover, specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight, 09-359 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317, writ denied, 10-2444 (La.10/21/11), 73 So.3d 376. Specific intent may also be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Graves, 99-113 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00), 759 So.2d 68. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Patterson, 63 So.3d at 148.
We find that, given the evidence produced at trial, the jury could have reasonably inferred that defendant had specific intent to kill or inflict great bodily harm. Several witnesses testified at trial that they saw defendant shoot at the 'victim. According to Brandon Dillard, after Williams fired shots at Johnelle Walker, he and Williams started walking towards a friend’s house. As they reached the middle of the parking lot, defendant came from the side and started shooting at Williams. In addition, Wythesia Dorsey testified that on June 16, 2010, she was in her Chateau Ames apartment lying down when she heard gunshots. She |7went to the window and observed a black male, whom she identified as defendant, running across the parking lot, with his arm extended behind him, firing shots.
Bianca Bridgewater, a resident of the apartment complex who was outside at the time of the incident, also testified at trial. Bridgewater stated that before any shots were fired, she saw defendant, whom she knew from high school, riding his bike. She heard about three gunshots and then saw defendant fall off his bike. According to Bridgewater, defendant got up and walked behind one of the apartment buildings. He emerged a few minutes later, talked to a young man, and then pulled out a gun and started shooting at a person in the parking lot.
In addition to this eyewitness testimony, the State also presented the testimony of Shaquille Smith. Although he did not witness the actual shooting, he testified that about two or three minutes after Williams shot at the teenager, defendant, along with *1153 some other individuals, approached him to find out what was going on. Smith testified that all these individuals, including defendant, had guns in their hands, and he did not. Smith left the area, and about two or three minutes later, he heard shots being fired. Smith returned to see what had happened and saw Williams lying on the stairs. Further, there was evidence produced at trial that defendant fired about thirteen shots at Williams. By defendant’s own admission, he emptied his gun. Thus, viewing the evidence presented at trial in the light most favorable to the prosecution, we find that the jury could have reasonably concluded that defendant had specific intent to kill or inflict great bodily harm upon the victim.
On appeal, defendant does not deny that he shot the victim, but insists he acted in self-defense after the victim used deadly force against him.
When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in |sself-defense. State v. Brown, 414 So.2d 726, 728 (La.1982). The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. LSA-R.S. 14:18.
According to LSA-R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger” or “[w]hen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.”
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. LSA-R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Theriot, 07-71 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08), 976 So.2d 715.
The determination of a defendant’s culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. State v. Theriot, 963 So.2d at 1020.
|nIn the instant case, the State adequately negated the defense of justification beyond a reasonable doubt. The evidence at trial established that Williams was the aggressor in the prior altercation with Walker. However, after Walker ran away, Williams ceased fire, and he and Brandon Dillard started walking to a friend’s house. According to the testimony of Brandon Dillard and Bianca Bridgewater, defendant fired first at the victim. Bridgewater specifically testified that on the day of the shooting, she saw defendant riding on a bike. Bridgewater heard three gunshots and then saw defendant fall off the bike, get up, and go behind a building. Bridge- *1154 water further testified that about two to five minutes later, defendant emerged from behind the building, talked to a young man, pulled out a gun, and started shooting at the victim who was in the parking lot. Moreover, at trial, defendant testified that he did not know if Williams ever shot at him, and in his statement to police, defendant admitted that Williams never fired at him after he opened fire. The evidence at trial further established that after the incident, defendant fled the scene and disposed of the weapon.
Dr. Karen Ross, an expert in forensic pathology, testified that she performed an autopsy on the victim. According to Dr. Ross, Williams died from a gunshot wound to the trunk which entered the lower left side of his back. She explained that the bullet went from left to right, from back to front, and slightly upward. Due to the upward path of the bullet, Dr. Ross believed that Williams was somewhat bent over at the trunk when he received the injury.
Defendant was the only witness who testified that the victim shot first. According to defendant, he was riding a bike when he heard some gunshots. As he looked to see where the shots were coming from, he fell off his bike and saw Williams coming at him with a gun. Not knowing who this person was, defendant thought he may have been the one who shot him eleven months earlier and that he |inwas trying to “finish what he started.” Defendant explained, “I grabbed my gun and went to shooting in my defense.”
The jury heard this conflicting testimony at trial and obviously gave more credit to the version of events portrayed by the State witnesses. Based on the evidence presented by the State, we find that any rational trier of fact could have concluded beyond a reasonable doubt that defendant did not act in self-defense.
Lastly, defendant contends that the evidence at best supported a verdict of manslaughter. Manslaughter is a homicide that would be either first or second degree murder, except that the offense was committed in “sudden passion” or “heat of blood” caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31 A(1). “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. State v. Dobbins, 05-342 (La.App. 5 Cir. 12/27/05), 920 So.2d 278, 284.
In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 523.
The jury clearly found that defendant failed to meet his burden of proof that he acted in “sudden passion” or “heat of blood.” The evidence supports the jury’s | nconclusion. As noted previously, the testimony at trial indicated that Williams ceased fire and retreated after his initial altercation with Walker. Several minutes later, defendant emerged from the back of a building and started shooting at Williams *1155 who was in the parking lot walking towards a friend’s house. Defendant, by his own admission, fired approximately thirteen shots. Further, in his statement, he said that Williams did not fire back after he started shooting at him.
Considering the circumstances of this case, defendant’s actions, and the extent and severity of the victim’s injuries, we find that the evidence was constitutionally sufficient to support the jury’s finding that defendant had the specific intent to kill or inflict great bodily harm on the victim and that defendant did not act in self-defense. Accordingly, the arguments raised by defendant relating to the sufficiency of the evidence lack merit.

ASSIGNMENT OF ERROR NUMBER TWO

Defendant next argues that the trial court erred in denying his motion for new trial based on its failure to remove a sleeping juror and replace that juror with an alternate prior to deliberations.
Before the jury retired to deliberate, defense counsel requested that the trial court use the alternate juror to replace a juror who was sleeping throughout the instructions. The State agreed that the juror was certainly falling asleep, but he did not know whether the juror’s eyes were just closed or whether the juror was “out cold.” The trial court denied defense counsel’s request noting that it watched the juror closely because her eyes were closed during the trial, but he did not believe she was sleeping and he felt that she was paying attention.
LSA-C.Cr.P. art. 789(A) provides, in pertinent part: “The court may direct that not more than six jurors in addition to the regular panel be called and | ^impaneled to sit as alternate jurors. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties.”
In State v. Cass, 356 So.2d 396 (La.1977), the Louisiana Supreme Court addressed the issue of a sleeping juror. During the first day of trial, the judge noticed that one of the jurors appeared to be asleep. The judge observed that the juror had his eyes closed and that his head was nodding. After watching him for two to four minutes, the trial judge, believing that the juror was ill, summarily ordered the removal of the juror and replaced him with an alternate. The defendant objected to the removal of the juror and asked for a mistrial, which the trial court denied. The Louisiana Supreme Court found that it was reversible error for the trial judge to summarily remove a juror under those circumstances. In so ruling, the court stated as follows:
[A]pplying Art. 789 C.Cr.P. we determine that even if the juror in question did briefly doze off, such is not per se proof of inability to perform, or any character of disqualification. Thus, there would be no legal cause for removing him. Had the juror been shown to have been sleeping through a substantial part of the trial or had he been unable to stay awake despite warnings or efforts to arouse him, and had defendant and the state been afforded an opportunity to explore on the record the defendant’s inability to perform on this account, we would be presented with a substantially different question for review.
In State v. Johnson, 463 So.2d 620 (La.App. 1 Cir.1984), on remand, 486 So.2d 787 (La.App. 1 Cir.1986), defendant argued that the trial court erred in refusing to excuse two jurors who appeared to be sleeping during the reading of the transcript of the victim’s prior testimony. The appellate court found no error in the trial court’s refusal to remove the jurors. The *1156 court noted that the trial judge stated that he noticed two women jurors had their eyes closed during the reading of the victim’s cross-examination from a prior trial. He noted, however, that he watched the jurors closely and did not believe that either of these jurors was asleep. | ^Further, defense counsel neither requested an opportunity to determine nor made any showing that the jurors were actually asleep or unable to perform.
In the instant case, the trial court noted that he was watching the juror closely and it appeared that “she was paying attention.” Moreover, there is no indication that the juror was sleeping through a substantial part of the trial. Defendant only made an objection during the reading of the jury instructions, which were sent back to the jurors during deliberations and could have been read by the juror independently. Moreover, defendant did not request a hearing to determine whether the juror was actually asleep or unable to perform her function. Accordingly, we find no error in the trial court’s refusal to remove the juror under the circumstances and in thereafter denying defendant’s motion for new trial.

PRO SE ASSIGNMENT OF ERROR NUMBER THREE

By this assigned error, defendant contends that he was unduly prejudiced by the trial court’s failure to answer a jury note which inquired into the difference between the verdicts. The record does not support this argument.
In response to the jury’s inquiry, the trial court sent the written jury instructions into the deliberation room, whereby the jury could review the potential verdicts. Both the State and defense counsel agreed that sending the jury instructions back to the jury was a proper response to the jury’s inquiry. Accordingly, as defense counsel agreed to the handling of the matter, this assigned error is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER FOUR

On appeal, defendant next contends that the trial court erred in refusing to inform the jury of the sentencing ranges for second degree murder, manslaughter, and negligent homicide.
14Pursuant to LSA-C.O.P. art. 802, the judge is required to charge the jury as to the law applicable to the case. This article specifies the charges which the trial court shall make to the jury, and it does not require the reading of the penalty provision. Generally, the jury need not be told of the applicable penalty on conviction because the imposition of sentence is solely within the province of the judge and is not a function of the jury, which is concerned with the guilt or innocence of the accused. State v. Prater, 337 So.2d 1107 (La.1976); State v. Albert, 430 So.2d 1279 (La.App. 1 Cir.1983), writ denied, 433 So.2d 711 (La.1983). However, when the penalty imposed by the statute is a mandatory one, the trial judge must inform the jury of the penalty on request of the defendant, and must permit the defense to argue the penalty to the jury. State v. Washington, 367 So.2d 4 (La.1978).
In the instant case, the trial judge advised the jury of the mandatory penalty for second degree murder. However, he was under no obligation to instruct the jury on the penalty ranges for manslaughter or negligent homicide. Accordingly, this assigned error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER FIVE
In this assigned error, defendant argues that the prosecution purposefully misled *1157 the defense when it filed its notice of potentially exculpatory evidence.
We first note that defendant did not raise this issue in the trial court, and therefore, it was not properly preserved for appellate review. See LSA-C.Cr.P. art. 841. Moreover, defendant’s argument has no merit.
On March 16, 2011, the State filed a notice of potentially exculpatory evidence. It gave notice that “Fallon Madison gave a statement to members of the District Attorney’s office that could be considered exculpatory. Specifically, Ms. Madison stated that when she arrived at the scene shortly after the murder, Brian | t ñWilliam’s cousin, Brandon, asked her what happened. Brandon Dillard told the police that he witnesses [sic] the murder. Ms. Madison also stated that she saw the defendant and the unidentified 17 year-old together the day before the murder, at the time the 17 year-old was taunting the victim.” Defendant appears to be arguing that this notice was misleading because Fallon Madison never made the statements to the police that are alleged in the notice. The notice clearly reflects that the statement was given to a member of the District Attorney’s Office, not the police; therefore, the information in the notice would not necessarily be contained in Madison’s statement to the police.
Accordingly, this argument likewise lacks merit.

PRO SE ASSIGNMENT OF ERROR NUMBER SIX

In his final pro se assigned error, defendant contends that the State purposely failed to inform the jury that Shaquille Smith had reached a “deal” with the district attorney to testify.
This alleged error was not raised by defendant in the trial court and is being presented for the first time on appeal. Accordingly, this issue was not properly preserved for appellate review. LSA-C.Cr.P. art. 841.
Moreover, there is no indication from the record before this Court that there was any “deal” between Shaquille Smith and the district attorney. The record shows that on March 28, 2011, the State filed a motion to compel Shaquille Smith’s testimony. In the motion, the State asserted that “no agreements have been made between the State of Louisiana and Shaquille Smith regarding the disposition of any criminal charges or investigations.” It further provided “no testimony or other information compelled under this order, nor any information directly or indirectly derived from such testimony or other information, will be used against Shaq-uille Smith in any criminal case, except a prosecution for perjury, giving a |1fifalse statement or otherwise failing to comply with the order.” On March 29, 2011, the trial court signed an order granting the State’s motion to compel the testimony of Shaquille Smith. At trial, the jury was not made aware of any “deal,” but was made aware that Shaquille Smith was there because of a material witness warrant. Moreover, we note that defense counsel, at no time, tried to question Shaquille Smith regarding any deal he had worked out with the State. For these reasons, this assigned error is without merit.

ERROR PATENT REVIEW

We have also reviewed the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
Our review of the record reveals a discrepancy between the transcript and commitment/minute entry which re *1158 quires correction. The transcript reflects that the trial court imposed the sentences on the two counts concurrently; however, the commitment/minute entry indicates that the sentence on the second degree murder count was imposed consecutively and the sentence on the obstruction of justice count was imposed concurrently. Generally, when there is a discrepancy between the transcript and the commitment, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983).
To ensure an accurate record, we remand the matter for correction of the commitment/minute entry to bring it into conformity with the sentencing transcript. On remand, we direct the district court to make the entry in the commitment/minute entry reflecting this change and direct the clerk of court to transmit the amended commitment/minute entry to the officer in charge of the institution to which the defendant has been sentenced as well as to the Louisiana [^Department of Public Safety and Corrections General Counsel. See LSA-C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846.
For the reasons set forth herein, we hereby affirm defendant’s convictions and sentences and remand the matter to the trial court for correction of the commit-meni/minute entry.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT/MINUTE ENTRY

. Defendant's appointed appellate counsel filed an appeal brief addressing two issues (Assignments of Error Numbers 1 and 2). Defendant then filed a pro se brief raising four additional alleged errors (Assignments of Error Numbers 3, 4, 5, and 6).

. Shaquille Smith is referred to as "Shorty” by witness Brandon Dillard.

. At trial, Johnelle Walker denied that he was in an argument with Williams the day prior to the shooting and further denied that he tried stealing a gun from him.