ROBERT M. MURPHY, Judge.
|2The defendant/appellant, Mr. Cody Yelverton, appeals his sentences for manslaughter and obstruction of justice, arguing that his sentence is excessive and unnecessary when a lesser sentence would better serve the defendant and the State of Louisiana.

FACTS AND PROCEDURAL BACKGROUND

On February 10, 2011, the defendant, Cody Yelverton, was charged by grand jury indictment with Count 1—second degree murder, in violation of La. R.S. 14:30.1, and Count 2—obstruction of justice, in violation of La. R.S. 14:130.1. The defendant was arraigned on February 18, 2011, and pled not guilty. The defendant filed various pre-trial motions, which were heard and denied on November 2, 2011. On April 23, 2012, the defendant withdrew his plea of not guilty and pled guilty to Count 2, obstruction of justice. On April 24-26, 2012, a jury trial was held on Count 1. On April 26, 2012, the jury found the defendant guilty of the responsive verdict of manslaughter. On May 9, 2012, the defendant filed a motion for acquittal notwithstanding the verdict and a motion for new trial. Both motions were denied on May 10, 2012.
On May 11, 2012, the trial court sentenced the defendant to 40 years at hard labor on Count 1, manslaughter, and 10 years at hard labor for Count 2, obstruction of justice, with those sentences to run consecutively, with credit for time served. On June 11, 2012, the defendant filed a motion to reconsider sentence, which was Isdenied on June 13, 2012. The defendant then filed a motion for appeal on July 5, 2012, which was granted on that same date.
At trial, Deputy Alan Welch with the Jefferson Parish Sheriff’s Office testified that he received a dispatch call on October 30, 2010 to proceed to 303 Metairie Lawn Avenue, near its intersection with Fagot Drive. The caller advised that there was a subject down in the street, who was bleed *57 ing, and it was unknown what had happened. Upon arrival, Deputy Welch observed the victim lying on the right side of the road with facial trauma. The victim was not responsive but was breathing, making moaning sounds, and gurgling.
Based on statements made by EMTs regarding the position of the victim and the fact that one shoe was missing, Deputy Welch notified his supervisor that it was a possible hit and run. The victim was transported to University Hospital. Deputy Welch then summoned the crime scene unit to the scene and they obtained photographs.
The victim had no identification on him. Deputy Welch went to University Hospital and met with Deputy Darren Monie, a night detective assigned to the case. Deputy Monie of the Jefferson Parish Sheriffs Office Criminal Investigations Bureau testified that he began his investigation at University Hospital. The victim was unresponsive but an AFIS machine was used to take fingerprints of the victim and he was then identified as Robert Mercadel. While at the hospital, Detective Monie learned that the victim had a gunshot wound to the head. He contacted his supervisor who then notified the commander of the homicide division. Deputy Monie also determined the victim’s address was 104 Hesper Avenue in Metairie. Deputy Monie went to the victim’s residence and spoke with family members. He interviewed the victim’s cousin, Victoria Manso, who told him the victim had been with persons named Cody and DJ. The victim 14later died as a result of the gunshot wound. The investigation was handed over to homicide detectives.
Dr. Marianna Sandomirsky, a deputy coroner for the Jefferson Parish Forensic Center, testified that she reviewed the autopsy report in this case and the cause of death was a gunshot wound to the head and the manner of death was listed as homicide. Photos included in State’s Exhibit 3 show a gunshot wound to the right eye on the head. Dr. Sandomirsky explained that stippling, the gunpowder deposited on to the skin, shows the distance of the shooter from the victim. In this case, there were probably only a few inches to a foot between the shooter and the victim. Dr. Sandomirsky testified there was a zero likelihood the victim would have survived the gunshot wound. In her professional opinion, Dr. Sandomir-sky believed the victim’s cause of death was a gunshot wound to the head.
Sergeant David Spera, a criminal investigator with the Jefferson Parish Sheriffs Office, participated in the investigation and conducted interviews to determine who may have been involved. Through his investigation, he learned about an altercation that led to the shooting and learned of the vehicle in which the shooting occurred, a red, four-door Chevy that was possibly parked at 5209 Arbor Court, later determined to be Auburn Court, in Kenner. Sergeant Spera went to that address and observed the tail end of a maroon or burnt orange vehicle parked with the trunk and doors open. He then spoke with residents of the townhome and obtained consent to search the area. Sergeant Spera observed all four doors of the car and the trunk open, with cleaning supplies next to or in the general area of the car. He testified that he smelled bleach. The cleaning supplies, including a mop and sponge, were seized along with the vehicle.
Sergeant Spera then obtained information on the location of Cody Yelverton, and he went to 2805 Haring Road in Metairie to investigate. Sergeant Spera found [ .¡the defendant, his pregnant girlfriend, Julia Eichensher, and her grandmother, Julia Bryant, at the residence when he arrived. Ms. Bryant answered the door and told *58 Sergeant Spera that the defendant was there. Sergeant Spera explained they were investigating a homicide and believed the defendant may have some information about it. Ms. Bryant gave Sergeant Spera consent to search the residence. No evidence was found or seized at that residence. The defendant was detained for questioning.
Sergeant Spera also participated in the search for Duane or “DJ” Croissant in St. Rose, Louisiana. He also received information that evidence associated with the murder may have been discarded either in the marsh or swamp in the St. Rose area. The defendant told Sergeant Spera and other officers where the evidence in St. Rose was located. Sergeant Spera went to these locations and participated in the investigation and searched for evidence. A make-up purse and a purse were located in the swamp area. The purse contained identification for Jessica Treadway, one of the occupants of the vehicle at the time of the shooting.
Victoria Manso, the victim’s cousin, testified at trial that on October 29, 2010, Ms. Treadway called and said she was having a party at her house. Ms. Manso, who was 16 years old at the time, invited the victim, Robert “Robbie” Mercadel, to go with her. The victim showed up at her house with friends, Nick, Ryan, and Shawn, in Nick’s Cadillac. Ms. Treadway picked up Ms. Manso with the defendant, Croissant, and Ms. Eichensher, the defendant’s girlfriend. They all went to Ms. Manso’s grandfather’s house to pick up money and to meet up with the victim. The victim and the defendant did not know each other. They met for the first time that evening.
Ms. Manso testified that the victim got out of the car and was being a “little aggressive” asking the defendant, “Who are you? What are you doing?” and trying |fito make sure that Ms. Manso was okay. Ms. Manso testified that the conversation ended well and the victim and the defendant calmed down and shook hands. Everyone then headed to a Shell station to meet up. On the way to the Shell station, Ms. Manso saw a gun in the car. She told the defendant and Croissant that she did not want the gun around her and she asked them to put it away. Croissant pulled the gun out and was looking at it and playing with it. At the Shell station, she went inside and told the victim there was a gun in the car. The victim walked out and started questioning Croissant and the defendant about why they had a gun. They then left the Shell station and went to Croissant’s house. The defendant, Croissant, Ms. Eichensher, and two “older people” went upstairs. Ms. Manso stated that she, Ms. Treadway, the victim and his three friends all sat downstairs. The victim stated that, “something is not right” and he said, “let’s go.” Croissant then brought the gun downstairs and handed it to Ms. Eichensher, who went outside with it. Ms. Manso did not see the gun after that. The victim then told Croissant to “put it away” and he asked “are you trying to shoot me or pop me?”
Ms. Manso and the victim left with Ms. Treadway, Nick, Ryan and Shawn a short time later and went to Nick’s house for approximately an hour or two. Ms. Manso then went to her aunt’s house at 104 Hes-per Avenue in Metairie, Louisiana, with the victim and Ms. Treadway. Ms. Manso testified that Ms. Treadway discovered she had Croissant’s phone and he wanted it back. So, Ms. Treadway told her she was going to have Croissant and the defendant pick her up. Ms. Treadway left about an hour later and walked down the street to Sal’s Snowball stand. The victim went with her. Ms. Manso testified she then went to sleep.
*59 Ms. Treadway testified at trial that she was friends with Ms. Manso and Croissant. She stated she had met the defendant two or three times. Ms. Treadway testified she knew the victim through Ms. Manso. Ms. Treadway testified that on |7October 29, 2010, when she was 16 years old, Croissant, the defendant, and Ms. Eichensher picked her up from her dad’s house. Croissant was driving a four-door Chevy or Ford that was reddish, almost maroon, in color. Ms. Treadway testified to the same events as Ms. Manso leading up to the encounter that resulted in the gunshot.
Ms. Treadway testified that Croissant was coming to Ms. Manso’s aunt’s house to pick her up and retrieve his phone. Croissant called Ms. Treadway and said he was in front of the snowball stand. Ms. Tread-way left the house and walked to the snowball stand. Ms. Treadway testified that the victim followed her from the house, stating that he wanted to talk to Croissant about why he had a gun earlier. Ms. Treadway stated that she and the victim got to Croissant’s car and the victim said he wanted to talk to the defendant. Croissant told the victim to get in the car because there were cops around the corner. Ms. Treadway was already in the car. The victim got in the car and sat behind the passenger seat, towards the middle. They drove approximately four to five blocks and parked in a lot of the apartment complex at Metairie Court and Fagot Street. Ms. Treadway testified that the victim was talking to the defendant, telling him that he wanted to know why he had a gun and why he had it out earlier that night. Ms. Treadway testified that the victim was being “kinda loud”, “jumping up and down”, and taking off his shirt. He kept saying “he had people on this corner, and this corner, and if they try anything that he would call them.” Then he screamed out the window and rolled the window back up. Ms. Treadway testified that the defendant was not saying anything. He was just leaning down towards the floor with his left hand down on the ground under the seat. The victim asked why he was sitting like that. The defendant said he was leaning down because the glove compartment was broken and papers were falling out. The victim asked the defendant if he had a gun on |Rhim. The defendant said he didn’t have a gun and that he was just fixing the glove box. Ms. Treadway testified that the victim then told the defendant “look, I just want to fight you” and “get out of the car and let’s fight.” Ms. Treadway testified that the defendant then leaned down all the way and turned around with the gun in his hand. Ms. Treadway stated that she saw a flash and then could not hear anything. Her ears were ringing and she saw the victim just lying there and she saw blood. Ms. Treadway testified that she opened the door and jumped out, causing her to fall and scrape her leg. Her school bag fell out with her. She grabbed the bag and pushed the door shut. She testified that her purse was left in the car. Ms. Treadway then heard the defendant say “go, go, go”. The victim was still in the backseat. The car sped down Fagot Street.
Ms. Treadway went to a friend’s house and her friend told her to call the police. She explained that she did not call the police because she was in shock. She went to sleep and when she woke up she called her dad, who had her sister pick her up. She told her mom, dad and sister what had happened and her mom took her to the police station. Ms. Treadway testified that she had blood on her jacket and sweater sleeves. At trial, Ms. Treadway identified the purse, which contained her identification, and the make-up bag found in the swamp as her items.
*60 Ms. Eichensher testified at trial that she and the defendant were engaged at the time of the incident. Ms. Eichensher testified that the defendant told her he had killed the victim. Ms. Eichensher further testified that the defendant had taken the gun from her grandmother’s house. She got the gun from him and put it in her friend Dawn’s kitchen drawer. Ms. Ei-chensher then drove Dawn’s red, four-door rental car that night. Ms. Eichensher stated that she saw the gun later that night with the defendant, either under or behind the passenger seat of the car. Ms. | gEichensher testified that around 3 a.m. she was sleeping when the defendant and Croissant came into the room, woke her up, and told her they had killed somebody.
Detective Troy Boulas was employed by the Jefferson Parish Sheriffs Office as a homicide detective. In the course of this investigation, he acquired information on the location of the defendant and learned he was possibly located at a house at 2805 Haring Street in Metairie, Louisiana. Detective Boulas, along with Detective Matt Vasquez and Detective Spera, went to that location. The defendant was found in an upstairs bedroom with his girlfriend. Both were taken into custody. The defendant told detectives that he knew they were going to be coming. Detective Bou-las advised the defendant of his Miranda[1] rights. He later went over the advice of rights form with the defendant at the detective bureau. The defendant provided a statement to Detective Boulas that he had hidden his bloody clothing in the backyard of the house where he was detained. The defendant then took detectives to the St. Rose/St. Charles Parish line where he had disposed of the other evidence in a marshy/swampy area. Detective Boulas testified that they found Ms. Treadway’s purse and the victim’s clothing in that area. The defendant also told detectives that he had discarded the firearm there, but they were unable to locate it.
Detective Matthew Vasquez of the Jefferson Parish Sheriffs Office Homicide Division also investigated the murder of the victim. He went to the scene, which was already processed, after the victim had been identified by name. He spoke with Victoria Manso again. His investigation led him to Croissant’s house and discovery of the fact that the defendant had been with him and Ms. Eichensher the night before. Detective Vasquez learned of the Arbor Court location. He went there and found the red vehicle parked beside the apartment |lnwith the doors open, airing out. Detective Vasquez also learned that Croissant had driven the vehicle the night before. The renter of the vehicle and other witnesses positively identified Croissant in a photo lineup. Detective Vasquez took Ms. Treadway’s statement again and she picked up where Ms. Manso left off in the order of events. Ms. Treadway identified the defendant in a photographic lineup.
The defendant testified at trial that after shooting the victim, he told Croissant to drive and to “go, go, go” because he was scared since he had just shot somebody. The defendant testified that he was not trying to run, he just didn’t know what to do. The defendant stated that he does not bring a gun to a fight. However, he also told police he carried a gun with him every day and had been fighting all his life, including hitting people with a weapon. The defendant testified that he opened the glove box and the gun dropped. After the victim kept accusing him of pulling a gun on him, the defendant said he kept trying to plead with him and tell him he had not done that. The victim then started yelling *61 and telling the defendant that his boys were right around the corner. The defendant stated he was getting a gun in arms reach to have it for protection. The defendant then testified that the victim took off his shirt and challenged him to a one-on-one fight. The defendant testified that he got the gun out when the victim started telling him about “his boys being around the corner”. The defendant testified that his justification for killing the victim was the victim saying “Oh, you got that burner? Let me get mine” and then the victim making a motion towards the side and towards the floor. The defendant testified he did not know what the victim was going for because it was dark in the car. The defendant testified that he believed the victim was reaching for a gun. He was looking at the victim’s face and the victim went to “slouch and reach”, so he reacted. After shooting the victim, the defendant took the body out of the car and left it on the side of the road._J¿jHe then rode to St. Rose, put on gloves, and dumped the evidence. He also testified that he wiped down the gun before he threw it. He then drove to a friend’s house to get bleach to wipe down and clean the car.
Prior to trial, the defendant pled guilty to obstruction of justice.[2] According to the guilty plea transcript, after the victim was shot and killed, the defendant disposed of evidence in an attempt to cover up the crime. The defendant disposed of the body at or near the intersection of Fagot Street and Metairie Lawn, by dumping the body out of the vehicle that the victim was killed in. The defendant then fled that location and disposed of evidence, including the gun associated with this crime, clothing, and other pieces of evidence. The defendant also used bleach, or some agent, to clean the interior of the vehicle in which the victim was shot. The defendant also took his clothes that he was wearing that may have contained evidence, hid them, and fled the scene of the crime.

ASSIGNMENT OF ERROR

The defendant contends that the Court imposed an excessive and unnecessary sentence when a lesser sentence would better serve the defendant and the State of Louisiana.

LAW AND DISCUSSION

In his single assignment of error, the defendant argues his sentence is excessive since the trial court imposed the maximum sentence for the manslaughter conviction and ordered his two sentences to run consecutively. The defendant argues the killing was a result of the victim’s own actions and not of his desire to kill someone; thus, this was an exceptional circumstance and not one with an 112undue risk of occurring again. The trial court focused on the actions of the defendant leaving the victim on the side of the road; however, the defendant argues this was done in a panicked state. He asserts that the maximum sentence should be reserved for the most egregious crimes. Further, the defendant contends that if the sentences were ordered to run concurrently rather than consecutively, he would be eligible for some reduction in the sentence and would take advantage of rehabilitation opportunities.
*62 The State argues in opposition that the defendant’s sentences are within the bounds of the statutes and are not excessive. Further, the State asserts that the trial court did not abuse its discretion in ordering that the defendant serve consecutive sentences based upon the finding that the homicide and the obstruction of justice were two clear and distinct separate crimes.
The defendant was originally charged with second degree murder (count one) and obstruction of justice (count two). The defendant pled guilty to count two, obstruction of justice. The defendant was convicted by a jury of the lesser verdict of manslaughter on count one. The trial court sentenced the defendant to the maximum 40 years for the manslaughter conviction and 10 years for the obstruction of justice conviction out of a maximum of 40 years. The trial court ordered these sentences to run consecutively.
At the sentencing hearing, the trial court provided the following reasons for that sentence:
... But, what’s most appalling about this entire case is abandoning — abandoning Mr. Robbie Mercadel’s body. I mean, once you made that decision to take his body and leave it onside of a street, to abandon his body, and with the testimony I heard with him still being alive at the time, is just something I can’t even imagine. Even if you had tried to get him to a hospital. But that didn’t happen. You left Robbie Merca-del there to die. Disposed of his belongings to cover up your crime.
| isThe trial court also ordered the sentences in count one and count two to run consecutively for the following reasons:
... Because the Court is of the opinion that there are two separate incidents. The murder occurred first, and then the Obstruction of Justice, Mr. Mercadel, Robbie Mercadel’s body was left onside of the street for a passerby to find. Not only that. Everything in regards to this case — I don’t think the gun was ever found, but everything else was thrown about in St. Charles Parish. The car was cleaned with bleach. You did everything you could possibly do to distance yourself from a crime that you committed, and at no time did you ever attempt to take responsibility for what happened. If anyone had not looked further — A lot of individuals thought that Mr. Mercadel had just been drunk and had fallen down, had hurt himself, but when they took a closer look they were able to figure out exactly what happened that night.
On June 11, 2012, the defendant filed a motion to reconsider sentence. In his motion, the defendant argued that his sentence was excessive. He asserted that a custodial environment is not necessary to protect the community from him and he presents no danger to society. He suggested that the manslaughter he committed was a direct result of the victim’s actions and there was no undue risk of it occurring again. He pointed out that he has no prior criminal record, other than minor misdemeanor convictions, has no felony convictions, and he fully cooperated with the police following his arrest.
Further, the defendant argued the consecutive nature of the sentences means he must serve the entire 40-year manslaughter sentence before beginning the 10-year obstruction of justice sentence. Thus, he suggested he is being denied the opportunity of parole eligibility or diminution of sentence through “good time”. The trial court denied the defendant’s motion to reconsider sentence on June 13, 2012.
Appellate review of sentences for excessiveness is a two-pronged inquiry. *63 State v. Lobato, 603 So.2d 739, 751 (La.1992). First, the record must show that 114the sentencing court complied with La. C.Cr.P. art. 894.1. Id. If this prong is met, a constitutional inquiry as to the ex-cessiveness of the sentence follows. Id.
First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The articulation of the factual basis for a sentence is the goal of La. C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981). There is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503, 516, writ denied, 02-2900 (La.4/4/03), 840 So.2d 1213 (citing State v. Jones, 33,111 (La.App. 2 Cir. 3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385).
In the instant case, at the sentencing hearing, the trial court heard numerous victim impact statements, as well as a statement by the defendant. In sentencing the defendant, the trial court considered the fact that the defendant was 25 years old and that this incident stemmed from a night of “drinking, drugging, and individuals not willing to just back down.” The trial court described that this is what happens when individuals just refuse to walk away and humble themselves. The trial court went on to find that the most appalling part of the entire case was 115the abandoning of Mereadel’s body on the street while he was still alive, leaving him there to die, and then disposing of the defendant’s belongings to cover up the crime.
In light of the foregoing, we find that these findings by the trial court satisfy the first prong of the excessive sentence inquiry.
Under the second prong, the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. *64 State v. Pearson, 07-332, p. 15 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court’s sentencing discretion, three factors are considered: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts. Pearson, 07-332 at 15-16, 975 So.2d at 656.
11fiBefore considering these three factors, we find that the defendant’s sentence is within the statutory limits. With regards to the defendant’s manslaughter conviction, at the time' of the offense, La. R.S. 14:31(B) provided: “Whoever commits the crime of manslaughter shall be imprisoned at hard labor for not more than forty years.” The defendant was sentenced to 40 years for his manslaughter conviction. Thus, the defendant’s sentence is within the statutory limits on count one.
Next, we will address the three factors to consider in reviewing the trial court’s sentencing discretion. First is the nature of the crime. Here, the defendant shot the victim at close range in the backseat of a car occupied by the victim and a 16-year-old witness. Following the shooting, the defendant left the victim on the side of the street to die and proceeded to discard belongings left in the vehicle, including the weapon, the witness’s identification and other evidence of the crime. The ■ defendant also attempted to clean the vehicle in which the victim was shot to remove the blood and any other evidence.
Moreover, it appears that the evidence adduced at trial would have supported a second degree murder verdict, and exposure to a mandatory life sentence. La. R.S. 14:30.1. Although the defendant contends that the shooting was caused by provocation, evidence was presented at trial which establishes that the defendant had the specific intent to kill Robbie Mercadel, or at the very least inflict great bodily harm. Accordingly, the responsive verdict of manslaughter was a valid verdict under the law. Specifically, the evidence presented at trial established that the victim was in the vehicle with the defendant, when the defendant retrieved a gun from the front passenger seat and shot the victim at close range. No testimony, other than the defendant’s, was presented to establish that any provocation or justification for the shooting existed. “Deliberately pointing and firing a deadly |17weapon at close range are circumstances which will support a finding of specific intent to kill.” State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 24, 27. Additionally, the law does not require that the intent to kill be of the specific victim but only that the defendant had the intent to kill someone. State v. Hall, 606 So.2d 972 (La.App. 3 Cir.1992), writ denied, 93-0051 (La.11/11/94), 644 So.2d 385.
Regarding the nature and background of the defendant, the record indicates that the defendant did not have any previous felony convictions. He only had prior minor misdemeanor convictions. Further, the defendant cooperated with police following his arrest by providing information concerning the location of evidence and by providing a statement concerning the events of that evening. However, the facts of this case also show that the defendant shot someone in the face at close range and then disposed of the victim while he was still alive.
Also, with respect to the defendant’s 40-year sentence for manslaughter, the jurisprudence reflects that the maximum penalty has been imposed in similar circumstances.
In State v. Harris, 11-626 (La.App. 5 Cir. 11/27/12), 105 So.3d 914, 917-18, 923-24, this Court upheld a sentence of 40 years at hard labor for a defendant who *65 was convicted of manslaughter. In Harris, the defendant was traveling in a car when he shot two victims that were walking on the sidewalk. Id. The defendant was convicted of manslaughter and negligent homicide. Id. The trial court sentenced the defendant to 40 years at hard labor for manslaughter and 5 years at hard labor for negligent homicide, with these sentences running consecutively. Id. This Court affirmed these sentences, finding they were supported by the record. Harris, 11-626, 105 So.3d at 931-32.
In State v. Bailey, 07-130, pp. 1-2 (La.App. 3 Cir. 10/3/07), 968 So.2d 247, the victim was shot multiple times with three different weapons by three different co-defendants. The defendants fled the scene and gathered the clothes and weapons for disposal. Id. The defendant in Bailey pled guilty to manslaughter and was sentenced to 40 years at hard labor. Id. On appeal, the Third Circuit affirmed the 40-year sentence for manslaughter. Id.
This Court in State v. Batiste, 06-869, p. 7 (La.App. 5 Cir. 4/11/07), 958 So.2d 24, affirmed a sentence of 40 years for a manslaughter conviction. In Batiste, the defendant deliberately pointed the gun at the victim and shot him at close range four times without provocation. Id. This Court affirmed the sentence and found the 40-year sentence is not unconstitutionally excessive. Id.
Finally, in State v. Williams, 03-1537, p. 1 (La.App. 3 Cir. 6/9/04), 875 So.2d 1043, writ denied, 04-1951, (La.12/17/04), 888 So.2d 864, the defendant pled guilty to manslaughter and was sentenced to 40 years at hard labor. In Williams, the defendant and the victim had an ongoing dispute. Id. The victim and the defendant had a confrontation regarding this dispute and the defendant shot the victim with a 12-gauge shotgun at point blank range. Id. On appeal, the Third Circuit affirmed the defendant’s sentence of 40 years at hard labor for his manslaughter conviction. Id. at 03-1537, p. 8, 875 So.2d at 1048.
With regard to the obstruction of justice conviction, at the time of the offense, La. R.S. 14:130.1(B)(1) provided: “When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.” The defendant was .originally charged with second degree murder, which provided for a penalty of life imprisonment at hard labor without benefit of parole, probation, or [ ^suspension of sentence. The defendant was subsequently sentenced to 10 years imprisonment on the obstruction of justice conviction. Thus, we find that the defendant’s sentence is within the statutory limits listed above for count two.
Next, we will address the three factors to consider in reviewing the trial court’s sentencing discretion on the obstruction of justice conviction. First is the nature of the crime. According to the guilty plea transcript, after the victim was shot in the backseat of the car, the defendant disposed of the body by dumping the victim’s body out of the vehicle near the intersection of Fagot Street and Metairie Lawn, in Me-tairie, Louisiana. The defendant disposed of evidence, including the gun associated with this crime, clothing, and other pieces of evidence. The defendant also used bleach, or some agent, to clean the vehicle in which the victim was shot.
Further, as discussed above regarding the nature and background of the defendant, the record indicates that the defendant only has minor misdemeanor convictions and cooperated with the police following his arrest. He provided a *66 statement to the police concerning what happened on the night of the incident and gave information regarding the location of evidence in the swampy area. However, as discussed above, the defendant did shoot someone in the face at close range and then took steps to dispose of the victim while he was alive and the evidence.
Also, with respect to the defendant’s 10-year sentence for obstruction of justice, the jurisprudence reflects that similar penalties, or harsher penalties, have been imposed in similar circumstances.
In State v. Ray, 10-1126, p. 2 (La.App. 4 Cir. 6/29/11), 70 So.3d 998, the defendant pled no contest to obstruction of justice and was sentenced to 20 years imprisonment at hard labor, to run concurrently with his 30-year sentence for | ^manslaughter. On appeal, the Fourth Circuit found that the defendant did not confess to the murder for seven months, gave two false statements, and disposed of the murder weapon. Id., 10-1126 at 12, 70 So.3d at 1006. The Fourth Circuit ultimately affirmed the defendant’s sentence on the obstruction of justice charge and found it is not excessive. Id.
This Court, in State v. King, 11-767, pp. 2, 17 (La.App. 5 Cir. 2/28/12), 88 So.3d 1147, writ denied, 12-660 (La.9/14/12), 99 So.3d 35, affirmed a sentence of 20 years for an obstruction of justice conviction, which ran concurrent with a life sentence for second degree murder. Id. In King, the defendant threw the murder weapon out of his window and off of the Huey P. Long Bridge. Id., 11-767 at 5, 88 So.3d at 1151. This Court found the 20-year sentence for obstruction of justice is not excessive. Id., 11-767 at 17, 88 So.3d at 1158.
Finally, the Second Circuit, in State v. Roberson, 40,809, p. 1 (La.App. 2 Cir. 4/19/06), 929 So.2d 789, found a maximum sentence of 40 years is not excessive for an obstruction of justice conviction. The defendant in Roberson was also convicted of second degree murder. Id. In Roberson, the body of the victim was found about 30 miles away from the site of the murder and DNA evidence was found in the trunk of a vehicle driven by the defendant. Id., 40,809 at 13, 929 So.2d at 800. The Second Circuit inferred that the defendant intentionally tampered with evidence relevant to the murder investigation. The Second Circuit affirmed the 40-year maximum sentence finding it is not excessive. Id., 40,809 at 32, 929 So.2d at 808.
In the instant case, the defendant shot the victim and attempted to cover up the crime by dumping the body on the street, and disposing of the murder weapon and other evidence by throwing it into a swampy area. The defendant also attempted to clean the vehicle, in which the crime occurred, with bleach to rid it of |¾1 evidence. Based on the record, as well as the sentences of similar cases, we find that the 10-year sentence imposed with respect to the defendant’s obstruction of justice conviction is neither grossly disproportionate to the offense, nor does it constitute a needless infliction of pain or suffering and is hereby affirmed.
Finally, the defendant asserts that his sentences are excessive because they were ordered to be served consecutively, rather than concurrently. In determining whether sentences are excessive, this Court should consider, among other factors, whether the convictions arise out of a single course of criminal conduct. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of impris *67 onment shall be served concurrently unless the court expressly directs that some or all be served consecutively.[3] La.C.Cr.P. art. 883.
A trial judge retains discretion to impose consecutive sentences on the basis of factors such as the offender’s past criminal acts, the violent nature of the charged offenses, or the risk that the defendant may pose to the safety of the community. State v. Williams, 08-556, p. 9 (La.App. 5 Cir. 1/13/09), 8 So.3d 3, 9, writ denied, 09-330 (La.11/6/09), 21 So.3d 298. If the trial court elects to impose consecutive sentences for crimes arising from a single course of conduct, it must articulate the reasons it feels the sentence is necessary. Id. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a liasingle course of conduct, consecutive sentences are not necessarily excessive. Id. (citing State v. Bradley, 02-1130 (La.App. 5 Cir. 3/11/03), 844 So.2d 115). Immediately after stating the sentences would be consecutive, the trial judge stated:
... Because the Court is of the opinion that there are two separate incidents. The murder occurred first, and then the Obstruction of Justice, Mr. Mercadel, Robbie Mercadel’s body was left onside of the street for a passerby to find. Not only that. Everything in regards to this ease — I don’t think the gun was ever found, but everything else was thrown about in St. Charles Parish. The car was cleaned with bleach. You did everything you could possibly do to distance yourself from a crime that you committed, and at no time did you ever attempt to take responsibility for what happened. If anyone had not looked further — A lot of individuals thought that Mr. Mercadel had just been drunk and had fallen down, had hurt himself, but when they took a closer look they were able to figure out exactly what happened that night.
The trial judge articulated an adequate factual basis to support the imposition of consecutive sentences in this case. Based on the foregoing, we find, in light of the facts of the case, the nature of the crimes and the jurisprudence, the sentences imposed were not unconstitutionally excessive, and the trial court did not abuse its discretion in imposing a sentence of 40 years for the defendant’s manslaughter conviction, and 10 years for the defendant’s obstruction of justice conviction, with these sentences to run consecutively.

ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
There is an inconsistency between the commitment and the transcript as to credit for time served. The commitment reflects that the defendant was given credit for time served; however, the transcript does not. Generally, the transcript prevails where there is an inconsistency between the minute entry and the *68 transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). However, failure of a trial court to give credit for time served requires no corrective measures. State v. Pascual, 98-1052 (La.App. 5 Cir. 3/30/99), 735 So.2d 98, 105. Credit for time served is self-operating even on a silent record due to La.C.Cr.P. art. 880, as amended. Id. Therefore, no correction action is necessary.

DECREE

For the reasons assigned herein, the sentences of the defendant Cody Yelverton are affirmed.

AFFIRMED

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. It is noted that according to La.C.Cr.P. art. 881.2(A)(2), the defendant cannot appeal or seek review of a sentence imposed in conformity with a plea agreement which was set forth in the record at the time of the plea. However, the plea agreement in this case on the obstruction of justice charge states the maximum exposure at 40 years with the “sentence to be determined.” Thus, the defendant may appeal the sentence ordered by the trial court on the obstruction of justice charge.

. Specifically, La.C.Cr.P. art. 883 provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.